**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

CHAMBERS OF
STEPHANIE A. GALLAGHER
UNITED STATES MAGISTRATE JUDGE

101 WEST LOMBARD STREET
BALTIMORE, MARYLAND 21201
(410) 962-7780
Fax (410) 962-1812

August 23, 2016

LETTER TO COUNSEL

       RE:    *L. Hall v. Commissioner, Social Security Administration*;
               Civil No. SAG-15-958

Dear Counsel:

      On April 2, 2015, Plaintiff L. Hall petitioned this Court to review the Social Security Administration's ("SSA") final decision terminating her Supplemental Security Income ("SSI") benefits in December 2005, because her income exceeded the limits of the need-based disability program. (ECF No. 1). I have considered the parties' cross-motions for summary judgment and Plaintiff's reply memorandum. (ECF Nos. 25, 30, 35). After the motions for summary judgment were filed and fully briefed, Ms. Hall's counsel, Leslie R. Stellman and Adam E. Konstas, filed a Motion for Leave to Withdraw as Counsel, (ECF No. 36), which was granted on July 5, 2016, (ECF No. 37). Accordingly, I have also considered Ms. Hall's Motion for Reconsideration of the Court's order granting her attorneys leave to withdraw, her counsel's response in opposition, and her reply. (ECF Nos. 40, 41, 42). I find that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the reasons discussed below, I will deny Ms. Hall's motion for reconsideration. I will also deny Ms. Hall's motion for summary judgment, grant the Commissioner's motion for summary judgment, and affirm the Commissioner's judgment pursuant to sentence four of 42 U.S.C. § 405(g). This letter explains my rationale.

     I.    **Motion for Reconsideration**

      Mr. Stellman and Mr. Konstas, represented Ms. Hall in her appeal to this Court of the Agency's decision that she was no longer eligible for SSI benefits. (ECF No. 1). In the course of their representation, Mr. Stellman and Mr. Konstas filed a motion for summary judgment on Ms. Hall's behalf, (ECF No. 25), and filed a response in opposition to the Commissioner's cross-motion for summary judgment, (ECF No. 35).

      On June 23, 2016, Mr. Stellman and Mr. Konstas notified Ms. Hall via electronic mail and overnight mail of their intention to withdraw as her counsel in the present matter.[1] (ECF No.

---

[1] The letter further provided that Mr. Stellman and Mr. Konstas would be willing to remain on the record as Ms. Hall's counsel "[s]ince there is no additional work to be performed in [this] case," if Ms. Hall agreed that: "(i) we are no longer representing you, (ii) we are not required to take any action in the case, including any action in the event of an adverse ruling (i.e., filing any motions for reconsideration, appeal, if appropriate, or otherwise), and (iii) you will consent to the withdrawal of our appearance immediately upon receipt of the Court's ruling on the pending motions practice."

36-2). The letter further advised that if Ms. Hall did not respond by close of business on Tuesday, June 28, 2016, Mr. Stellman and Mr. Konstas would withdraw their appearance as counsel. *Id.* Ms. Hall did not respond, and Mr. Stellman and Mr. Konstas filed a motion for leave to withdraw as counsel on July 1, 2016. (ECF No. 36). In so doing, Mr. Stellman and Mr. Konstas fully complied with the procedural requirements of the local rules. *See* Loc. R. 101(2)(a) (requiring withdrawing counsel to file a certificate stating the name and last known address of the client and that a written notice has been served on the client at least seven days prior to the withdrawal); (ECF No. 36-2). This Court granted Mr. Stellman and Mr. Konstas's motion for leave to withdraw as counsel on July 5, 2016. (ECF No. 37). Ms. Hall filed a motion for reconsideration of the decision on July 14, 2016, (ECF No. 40). Mr. Stellman and Mr. Konstas filed their opposition on July 20, 2016, (ECF No. 41), and Ms. Hall filed her reply on August 8, 2016, (ECF No. 42).

Ms. Hall argues that Mr. Stellman misrepresented his reasons for seeking to withdraw as counsel, and Mr. Konstas's availability to remain as counsel of record. Specifically, Ms. Hall contends that Mr. Stellman told her that he was withdrawing as counsel for reasons related to his health and well-being. (ECF No. 40 at 2); *see also* (ECF No. 42 at 14) ("I cannot risk this to my life and my health on a daily basis, so I will have to transition all pending matters out of this office."). Ms. Hall contends that she did not understand these reasons to affect whether Mr. Konstas would remain as counsel of record, (ECF No. 40 at 1-2), nor was she notified of the "[d]ifferences" which Mr. Stellman and Mr. Konstas alleged made it "impossible . . . to continue representing Plaintiff in these proceedings." (ECF No. 36 at 1). Furthermore, Ms. Hall asserts that Mr. Stellman and Mr. Konstas's decision to withdraw from representation may have been economically driven. *See* (ECF No. 42 at 2) ("In essence, some months into the Firm's representation a conflict was discovered within the Firm such that the MedStar case was jettisoned and with it the prospect of a flow of funds such that the SSA/SSI matter as a stand-alone case could no longer be justified on economic grounds.").

Ms. Hall also cites Model Rule of Professional Conduct 1.16(d), which provides that:

> Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred.

Along these lines, Ms. Hall asserts that, "Attorney Stellman should and could have known that especially on a holiday weekend there was virtually no possibility that replacement counsel could be identified and engaged." (ECF No. 40 at 2). She further asserts that Mr. Stellman failed to follow the proper procedures for sending case records to her current address, and as a result, that "four binders" of case records are missing. *Id.* Finally, she alleges that Mr. Stellman has not made an accounting of any escrow funds or returned any unused funds to her. *Id.* Ultimately, Ms. Hall argues that allowing Mr. Stellman and Mr. Konstas to withdraw as counsel is detrimental because it deprives her of counsel "Possessing Unique and Irreplaceable Knowledge

of the Highly Relevant Predecessor Case," and because it could lead to the "Loss of Access to Health Care Benefits with Potentially Lethal Consequences."[2]  (ECF No. 42 at 6-8).

"The decision to grant or deny an attorney's motion to withdraw is committed to the discretion of the district court." *Abbot v. Gordon*, No. DKC-09-0372, 2010 WL 4183334, at *1 (D. Md. Oct. 25, 2010) (citing *Whiting v. Lacara*, 187 F.3d 317, 320 (2d Cir. 1999)); *see also Fleming v. Harris*, 39 F.3d 905, 908 (8th Cir. 1994); *Washington v. Sherwin Real Estate, Inc.*, 694 F.2d 1081, 1087 (7th Cir. 1982). Local Rules 703 and 704 provide that lawyers practicing in this Court are subject to the Maryland Rules of Professional Conduct ("MRPC"). MRPC 1.16, which is substantially the same as ABA Model Rule of Professional Conduct 1.16 cited by Ms. Hall, provides a benchmark for when withdrawal is permitted.  MRPC 1.16 (a) addresses mandatory withdrawal, and subsection (b) addresses permissive withdrawal. Subsection (b) states, in relevant part:

> Except as stated in paragraph (c) a lawyer may withdraw from representing a client if:
>
> (1) withdrawal can be accomplished without material adverse effect on the interests of the client;
>    . . .
>
>  (7) other good cause for withdrawal exists.

MRPC 1.16(b). Subsection (c) provides that, "[a] lawyer must comply with applicable law requiring notice to or permission of a tribunal when terminating representation. When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation." MRPC 1.16(c).

While there is little case law defining what constitutes "material adverse effect," this Court has held that there is no material adverse effect or prejudice "where there [are] 'no impending deadlines' and it [i]s 'clear that the attorney-client relationship has broken down.'" *Respess v. Travelers Cas. & Sur. Co.*, No. ELH-10-2937, 2011 WL 1344137, at *4 (D. Md. Apr. 7, 2011) (quoting *Abbott*, 2010 WL 4183334, at *3). Likewise, the Court has declined to extend an attorney-client relationship merely on the grounds that a plaintiff "may later attempt to file another suit." *Id.*

In the instant case, both parties' motions for summary judgment are fully briefed. Thus, as in *Abbott*, there are no impending deadlines. Accordingly, Ms. Hall would only need the continued assistance of an attorney if she disagrees with this decision, and wishes to file an appeal to the United States Court of Appeals for the Fourth Circuit. However, I decline to

---

[2] Specifically, Ms. Hall asserts that "Counsel is aware that there is a direct benefit status – Qualified Medicare Beneficiary (QMB) – assigned to the SSA/SSI beneficiary which remains in force until a final decision has been rendered and any and all appeal opportunities have been exhausted." (ECF No. 42 at 6-7). Additionally, she states that, "Counsel is further aware that withdrawal of representation in the absence of resolution of these issues carries potentially lethal consequences," though she does not enumerate what those potentially lethal consequences are. *Id.*

extend the attorney-client relationship on those grounds.[3] In so holding, I note that I have fully considered Ms. Hall's status as a person with a disability, but nevertheless find that she is not prejudiced by the withdrawal of her attorneys in the present matter since there is no further work to be performed in this Court.[4] In addition, I note that MRPC 1.16(d) outlines the obligations of an attorney "[u]pon termination," and does not govern whether an attorney should be granted leave to withdraw in the first instance. While I agree that Mr. Stellman and Mr. Konstas should do everything possible to comply with their obligations under MRPC 1.16(d), I find that those obligations have no impact on whether their withdrawal would prejudice Ms. Hall in this case.

## II. Motions for Summary Judgment

This case has a lengthy procedural history. In December 2001, an Administrative Law Judge ("ALJ") found that Ms. Hall had been disabled within the meaning of the Social Security Act since July 2000, and awarded her SSI benefits. (Tr. 1061, 1348-51). In March 2003, SSA notified Ms. Hall that it was reviewing her continuing eligibility for SSI benefits. (Tr. 1463, 1465). Based on the findings from a redetermination interview, the Agency recommended terminating Ms. Hall's benefits as of June 2003, finding that her income exceeded the statutory limits of the SSI program beginning in April 2003. (Tr. 1061). Ms. Hall requested reconsideration of the Agency's decision to terminate her benefits, and elected to continue receiving benefits until that request was adjudicated. (Tr. 478); *see* 20 C.F.R. §§ 416.996(f), 416.1336(b). In November 2005, SSA ruled on Ms. Hall's request for reconsideration, upholding its earlier determination that her SSI benefits should be terminated. (Tr. 461). Accordingly, Ms. Hall's SSI benefits were terminated in December 2005. (Tr. 1061). Ms. Hall then requested a hearing challenging the termination of her benefits. A hearing was held in August 2006, and a second, supplemental hearing was held in May 2007. (Tr. 910-30, 931-69). In January 2008, the ALJ issued a decision upholding the termination of Ms. Hall's SSI benefits, and finding that her income exceeded the requirements for receiving SSI benefits. (Tr. 14-19). Specifically, the ALJ held that funds Ms. Hall had received from four individuals, including Rev. Charles Talar,[5] Ms. Shirley Stewart (Ms. Hall's mother), Ms. Mary-Ann White, and Ms. Trudy Koslow, did not qualify as bona fide loans. Thus, the ALJ held that the funds from these individuals should be included in calculating her income. The Appeals Council ("AC") denied Ms. Hall's request for review of that decision in March, 2009. (Tr. 8-12).

Following the AC's decision, Ms. Hall filed a complaint in this Court challenging the Agency's decision to terminate her SSI benefits. United States Magistrate Judge Susan K. Gauvey remanded the case to the Agency in an opinion dated February 10, 2011, finding that the

---

[3] I note that Ms. Hall has 60 days from the date of this decision to file an appeal to the Fourth Circuit, since one of the parties in this matter is a Government agency. 4th Cir. R. 4(a)(1)(B)(ii). Thus, Ms. Hall has ample time to find new counsel if she decides to appeal this decision.

[4] Furthermore, I note that Ms. Hall's status as a Qualified Medicare Beneficiary would not be affected since she has not yet exhausted all appeal opportunities.

[5] Rev. Talar appears in the record as both Dr. Talar and Rev. Talar, however for the ease of reference in this opinion, I will refer to him as Rev. Talar.

ALJ erred by: (1) not considering the subject matter of each loan to determine whether the loan proceeds would constitute income if conveyed gratuitously; (2) failing to consider extrinsic evidence of the parties' intent in determining whether the loans were bona fide; and (3) failing to explain with particularity the basis for the determination that her income or resources exceeded SSI limits. (Tr. 1062). *See Hall v. Astrue*, No. 1:09-cv-01086-SKG, 2011 WL 502386 (D. Md. Feb. 10, 2011). On remand, an ALJ held a hearing on March 1, 2012. (Tr. 2337-67). Following the hearing, the ALJ issued an opinion dated January 4, 2013, upholding the termination of Ms. Hall's benefits. The ALJ held that none of Ms. Hall's agreements for the provision of financial support constituted bona fide loan agreements, and, as a result, that her income and resources exceeded the SSI limits beginning in April 2003. (Tr. 1058-1080). The AC found "no reason under [the Agency's] rules to assume jurisdiction," (Tr. 972-78), so the ALJ's January 4, 2013 decision constitutes the final, reviewable decision of the Agency.

Ms. Hall disagrees, and raises two primary arguments on appeal. [6] Ms. Hall, through then-counsel, argues that the ALJ erred in his analysis of whether financial agreements she had with several individuals constituted bona fide loans. Specifically, she contends that the ALJ "overlooked evidence that the parties intended to make an enforceable loan agreement at the time of the transaction," and "overlooked other evidence that the parties intended to form an enforceable loan obligation." Pl. Mem. at 11, 14. Next, Ms. Hall argues that the ALJ committed procedural error in failing to issue a subpoena commanding a witness to testify, and thus, failed to consider "key evidence." *Id.* at 18. Each argument lacks merit and is addressed below. In addition to Ms. Hall's arguments, the Commissioner also asserts that Ms. Hall's resources exceeded SSI limits because she had access to funds from the Mildred Pierce Batchelder ("MPB") Trust for her support and maintenance, and was not required under the trust instrument to reimburse the amounts withdrawn. The Commissioner's argument is also addressed below.

Regarding Ms. Hall's first argument, she contends that the ALJ failed to review evidence in the record demonstrating that she had enforceable loan agreements with several individuals at the time of their respective transactions. In support of her argument, Ms. Hall points to written agreements that were executed in 2003, and that allegedly codified verbal agreements made in November of 2000, with Rev. Talar, Ms. Stewart, and Ms. White, and an affidavit executed by Ms. Koslow indicating an agreement as early as 2002.

---

[6] Initially, Ms. Hall filed a motion to reopen her prior appeal before Judge Gauvey for review of the Agency's decision. *Hall v. Astrue*, Civ. No. SAG-09-1086, ECF No. 40. Ms. Hall argued that Judge Gauvey's opinion was ambiguous regarding whether she remanded the case pursuant to sentence four or sentence six of 42 U.S.C. § 405(g), and that the ambiguity should be resolved in her favor. However, as I noted at the time, Judge Gauvey's decision to remand "was not based on any new and material evidence, nor did she make a finding that there was good cause for the failure to incorporate such evidence in the earlier proceeding," as required by sentence six. *Id.* at ECF No. 49. Thus, I found that Judge Gauvey's opinion should be construed as a remand pursuant to sentence four, and that therefore, Ms. Hall was required to file a new civil action to pursue her appeal. *Id.* Accordingly, my review of the Agency's final decision is not limited to reviewing any particular findings of fact, and instead, is a review of whether the decision, in its entirety, is supported by substantial evidence.

Social Security regulations provide detailed guidelines for determining what income counts toward the SSI eligibility limits and what constitutes a bona fide loan. Under the regulations, income is "anything you receive in cash or in kind that you can use to meet your needs for food and shelter." 20 C.F.R. § 416.1102. SSA regulations set limits for the amount of income and resources an individual may have or receive in a given month in determining financial eligibility for SSI.[7] Current regulations provide that, for the purposes of SSI eligibility, a single individual may not have countable resources valued in excess of $2,000 in a given month. POMS SI 01110.003. Likewise, an individual's monthly income may not exceed the income break-even point, which is the point at which the individual has income, either earned or unearned, equal to the applicable Federal benefit rate ("FBR"). POMS SI 00810.350. The current applicable break-even points for an individual are $1,551 in earned income per month, and $753 in unearned income per month. *Id.*

The regulations provide certain exceptions for items that are not counted as income for SSI purposes, including "money you borrow or money you receive as repayment of a loan." 20 C.F.R. § 416.1103(f). Social Security Ruling ("SSR") 92-8p provides that:

> A loan means an advance from lender to borrower that the borrower must repay, with or without interest. A loan can be cash or an in-kind advance in lieu of cash. For example, an advance of food or shelter can represent a loan of the pro rata share of household operating expenses. This applies to any commercial or noncommercial loan (between relatives, friends or others) that is recognized as enforceable under State law. The loan agreement may be oral or written, as long as it is enforceable under State law.

Further, SSR 92-8p states that, "When money or an in-kind advance in lieu of cash is given and accepted based on any understanding other than that it is to be repaid by the receiver, there is no loan involved for SSI purposes." The Agency's Program Operations Manual System ("POMS") specifies that a bona fide loan must meet the following five criteria: (1) it must be enforceable under State law; (2) it must have been in effect at the time of the transaction; (3) it must acknowledge the obligation to repay; (4) it must establish a plan for repayment; and (5) repayment must be feasible. POMS SI 01120.220(D)(1)-(5). Thus, if a loan meets these criteria, and is found to constitute a bona fide loan, it is not treated as income for the purposes of SSI eligibility. It is the claimant's burden to demonstrate that bona fide loan agreements exist. SSR 92-8p. This Court must uphold the decision of the Agency if it is supported by substantial evidence and if the Agency employed proper legal standards. *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Applying these standards, I find that the ALJ properly supported her determination that Ms. Hall's income and resources

---

[7] SSA regulations distinguish between income and resources. *See* POMS SI 00810.030; *see also* (Tr. 1067-68). Income is anything received in a month from any source that is otherwise consistent with the definition of income for SSI purposes. *Id.* Anything owned by an individual in the month prior to the month under consideration is deemed to be a resource, and is subject to regulations governing resources. *Id.* Likewise, an item an individual receives is only counted as income in the month in which it is received. *Id.* Anything held thereafter is deemed to be a resource. *Id.* Thus, cash payments from a trust are treated as income in the month in which they are received, and any funds held thereafter are treated as resources. *See* POMS SI 00835.300.

exceeded the limits for SSI eligibility with substantial evidence. I will discuss each of Ms. Hall's alleged loans and the ALJ's finding with respect thereto in turn.

Regarding funds from Ms. Stewart, the ALJ found that Ms. Stewart and Ms. Hall did not have a bona fide loan agreement, and that the amounts Ms. Stewart gave to Ms. Hall in the form of checks constituted gifts rather than income. (Tr. 1071-72). The ALJ found that Ms. Stewart gave Ms. Hall approximately $98,000 to cover living expenses between 2002 and 2007. (Tr. 675-735); *see also Hall v. Astrue*, 2011 WL 502386, at *1. Additionally, the ALJ found that Ms. Hall did not have a written agreement with Ms. Stewart until April 30, 2007, several years after she started receiving money from Ms. Stewart in 2002. The 2007 agreement states, in part:

> I, L. Hall, agree to reimburse Shirley Stewart, my Mother, who has loaned me money . . . I commit to repay the entire loan, including any future indebtedness, from such proceeds as I receive from employment as and when I renter [sic] the competitive work environment and/or settlement of the matters pending before the State of Connecticut Appellate Court in connection with violations of my person, my property and my privacy.

(Tr. 663). The ALJ noted that Ms. Hall received approximately $35,000 from a litigation settlement in 2003, and another settlement of $13,000, but Ms. Hall had "no recollection whatsoever" of what she did with the settlement proceeds. (Tr. 1542-43, 1548-49, 2415-16) (testifying that she has no recollection of what she did with settlement proceeds as a result of her dissociative amnesia diagnosis). Ultimately, the ALJ found that Ms. Hall's agreement with Ms. Stewart was not a bona fide loan because it was "contingent on future improvements in [Ms. Hall's] financial circumstances." (Tr. 1072). Additionally, the ALJ noted that the agreement with Ms. Stewart did not identify which State law would apply to the contract and offered no specificity as to the amount owed under the contract. *Id.*

Ms. Hall argues, and the record demonstrates, that Ms. Hall also executed a written agreement with Ms. Stewart on March 31, 2003, which the ALJ failed to consider. The 2003 agreement contains similar language to the 2007 agreement, and states, in part:

> This will codify our informal, verbal agreement created at the inception (November, 2000) of your kind and essential support. Specifically, as indicated, it is my intention to repay you in full, and that this obligation will be met from either earnings when I return to the competitive work environment, settlement proceeds when one or more of the legal issues is brought to closure or a combination of both.

(Tr. 664). Reviewing the 2003 and 2007 agreements with Ms. Stewart, I find that both suffer the same deficiencies and fail to meet the standards of a bona fide loan agreement. Thus, the ALJ's failure to discuss the 2003 agreement is harmless error.

As Judge Gauvey noted in her 2011 opinion, the Court must first determine whether the underlying purpose of the loan proceeds in question falls within the definition of income. *See* 20 C.F.R. § 416.1102. Here, the record demonstrates that Ms. Stewart provided Ms. Hall cash in

the form of personal checks, which constitute income. (Tr. 675-735). Accordingly, the Court proceeds to determine whether the agreements with Ms. Stewart otherwise meet the requirements of a bona fide loan, which would be exempt from the calculation of Ms. Hall's income.

As noted above, the Agency outlines five requirements of a bona fide loan for SSI income purposes. POMS SI 01120.220(D)(1)-(5). The first of those requirements is that the agreement be enforceable under State law. *Id.* It is not clear, for either the 2003 agreement or the 2007 agreement, which State law would govern the agreements with Ms. Stewart. The 2003 agreement was sent by Ms. Hall from a Maryland address to Ms. Stewart at a Connecticut address, and the writing does not specify which State law governs the agreement. (Tr. 664). The 2007 agreement was notarized in Maryland, but is only signed by Ms. Hall. (Tr. 663). It does not specify which State's law governs the agreement. *Id.* In addition, the applicable State law is particularly ambiguous in this case, since Ms. Hall claimed to have access to residences in both Maryland and Virginia. (Tr. 1069, 2393).

Even if the Court applies Maryland contract law, as Ms. Hall suggests, her agreements are not enforceable. Pursuant to Maryland contract law, "A contract is formed when an unrevoked offer made by one person is accepted by another." *County Comm'rs for Carroll County v. Forty West Builders, Inc.*, 941 A.2d 1181, 1209 (Md. Ct. Spec. App. 2008) (quoting *Prince George's County v. Silverman*, 472 A.2d 104 (1984)). To establish a contract, "the minds of the parties must be in agreement as to its terms," *id.* at 1209-10, and must express those terms "with definiteness and certainty the nature and extent of the parties' obligations." *Kiley v. First Nat. Bank of Maryland*, 649 A.2d 1145, 1152-53 (1994). Specifically, the language of the contract "must not only be sufficiently definite to clearly inform the parties to it of what they may be called up on by its terms to do, but also must be sufficiently clear and definite in order that the courts, which may be required to enforce it, may be able to know the purpose and intention of the parties." *Robinson v. Gardiner*, 76 A.2d 354, 356 (1950). A promise that "defies legal enforcement" due to "its indefinite nature" is illusory. *Goldstein v. Miles*, 859 A.2d 313, 329 (Md. Ct. Spec. App. 2004).

In both of Ms. Hall's written agreements with Ms. Stewart, Ms. Hall's obligation to repay is contingent on her return to the workforce or on her receipt of settlement funds from matters of pending litigation. (Tr. 663-64). This fails to establish a bona fide loan since it is an illusory promise that "defies legal enforcement" due to "its indefinite nature." *Goldstein v. Miles*, 859 A.2d 313, 329 (Md. Ct. Spec. App. 2004). Notably, the agreements do not state how Ms. Hall would repay her obligation if she never returns to the workforce and does not receive any settlement awards from pending litigation. (Tr. 663-64). Likewise, the agreements do not state the extent of Ms. Hall's obligation if the funds from either of those scenarios falls short of the amount owed to Ms. Stewart; when Ms. Hall would be determined to have defaulted on the loan; or Ms. Stewart's rights in seeking to enforce the loan.

Ms. Hall's agreements with Ms. Stewart potentially meet the Agency's second and third requirements for a bona fide loan. The Agency's second requirement is that the agreement be in effect at the time of the transaction. Ms. Hall argues that the existence of the 2003 written agreement demonstrates such an intent since it "codif[ies] [her] informal agreement at the

inception (November, 2000) of [Ms. Stewart's] support." (Tr. 664). Next, SSA regulations require that a bona fide loan agreement acknowledge the obligation to repay. Both the 2003 and 2007 agreements acknowledge this obligation. *See* (Tr. 663) ("I commit to repay the entire loan, including any future indebtedness . . ."); (Tr. 664) ("[I]t is my intention to repay you in full . . ."). Nevertheless, Ms. Hall's 2003 and 2007 agreements with Ms. Stewart fail to satisfy the fourth and fifth elements of a bona fide loan since neither sets out a plan for repayment or demonstrates that repayment is feasible. As noted above, Ms. Hall's agreements with Ms. Stewart are contingent on her ability to return to the workforce or her receipt of settlement proceeds from pending litigation. The agreements do not provide any detail on either party's rights or obligations in the event that neither of these contingencies come to fruition. Thus, the agreements do not set out a plan for repayment or demonstrate that repayment is feasible. Accordingly, I agree with the ALJ that Ms. Hall's agreements with Ms. Stewart fail to meet the requirements of a bonda fide loan, and find that the ALJ supported the findings in her 2013 decision with substantial evidence.

Ms. Hall's agreements with Rev. Talar suffer the same deficiencies as her agreements with Ms. Stewart. The record is clear that the funds provided by Rev. Talar were used for housing or food, and would thus fall within the Agency's definition of income for SSI purposes. Specifically, in October 2001, Rev. Talar wrote a letter to the Courthouse Square Apartments stating that, "upon her arrival in the State of Maryland and for many months thereafter Ms. Hall occupied one of several facilities owned and maintained by the Society of St. Sulpice." (Tr. 41). He further provided, "[w]ith respect to her financial affairs, I . . . can confirm that Ms. Hall has access to more than $40[k]/year; that her financial agents and trusts are offshore; and that I will personally guarantee her rental obligation until such time as she has obtained gainful employment." *Id.* An affidavit signed by Rev. Talar in 2005 states that that he has "paid and continue[s] to pay all rental fees and costs as well as basic utilities with the exception of basic telephonic services" since "the inception of the lease at Courthouse Square." (Tr. 749). Rev. Talar estimated that he pays, on average, $1,500 per month for Ms. Hall's rent and utilities. (Tr. 2354). Furthermore, the record also shows that Ms. Hall had access to a joint bank account with Rev. Talar with a balance that regularly exceeded SSI limits. (Tr. 153-296).

The agreements with Rev. Talar contain nearly identical language as the agreements with Ms. Stewart. Ms. Hall executed written agreements with Rev. Talar in 2003, and again in 2007.[8] (Tr. 748, 1514). As noted above, these agreements lack several elements required of a bona fide loan. Specifically, they do not specify which State law would apply in enforcing the agreements, and would not meet the requirements of Maryland contract law if it were applied. While the agreements may demonstrate that an agreement existed at the time of the initial transaction and acknowledge the obligation to repay, they nevertheless fail to establish a plan for repayment or demonstrate that repayment is feasible. Ms. Hall's agreements with Rev. Talar are contingent on

---

[8] The 2003 agreement provides that, "This will codify our informal, verbal agreement created at the inception (November, 2000) of your kind and essential support. . . . [I]t is my intention to repay you in full, and that this obligation will be met from either earnings when I return to the competitive work environment, settlement proceeds when one or more of the legal issues is brought to closure or a combination of both." (Tr. 1514). Likewise, the 2007 agreement states that Ms. Hall commits "to repay the entire loan, including any future indebtedness," from her earnings upon returning to the workforce or from the proceeds of legal settlements. (Tr. 748).

her return to the workforce or her receipt of settlement proceeds from pending legal actions, and do not otherwise lay out a plan for repayment should those contingencies fail. (Tr. 748, 1514). Accordingly, I find that Ms. Hall's agreements with Rev. Talar do not meet the requirements of a bona fide loan, and thus should be counted as income for SSI purposes.

Regarding the loans from Ms. White and Ms. Koslow, the ALJ properly found that their loans were largely in the form of services that were not convertible to cash, and therefore did not constitute income. (Tr. 1076-78). The ALJ found that Ms. Hall owed Ms. White approximately $40,000 to $60,000 for administrative services. (Tr. 1076). Specifically, "Ms. White helped her with drafting letters and responses in lawsuit in Connecticut, against both the Maryland and Virginia DORS vocational rehabilitation agency and with SSA. Ms. White also helped the claimant with support for any professional activities she had." *Id.* While the ALJ noted that the agreement with Ms. White referenced that Ms. Hall "received monies in connection with the pursuit of vocational rehabilitation goods and services," (Tr. 1076), the ALJ ultimately found that, "Ms. White's activities are services that would assist the claimant with re-entering the workforce, but are not readily transferred into food, shelter, or other necessities. As such, Ms. White's services are not income for SSI purposes." (Tr. 1076-77). Likewise, the ALJ found that the loan from Ms. Koslow consisted of her services as a vocational rehabilitation counselor, and thus could not be converted to cash. (Tr. 1077-78). Accordingly, the ALJ properly found that the loans of services from Ms. White and Ms. Koslow did not fall within the definition of income, and should not be included in determining Ms. Hall's financial eligibility for SSI benefits.

Next, Ms. Hall argues that the ALJ overlooked other evidence tending to show that she had enforceable loan agreements with Ms. Stewart, Rev. Talar, Ms. White, and Ms. Koslow. Specifically, Ms. Hall cites evidence including: an affidavit from Rev. Talar, (Tr. 749); an affidavit from Ms. White, (Tr. 754-55); testimony from Rev. Talar that he expected to be repaid by Ms. Hall, (Tr. 2351); testimony from Ms. Koslow that she had an agreement with Ms. Hall dating back to 2002, (Tr. 2382); and evidence that Ms. Hall had repaid portions of loans to some individuals, (Tr. 2414, 2419). Ms. Hall argues that this evidence demonstrates that the parties intended to form enforceable loan agreements. Even so, the evidence cited by Ms. Hall does not demonstrate that her loans were bona fide under SSA regulations. While the evidence cited may provide additional information about the parties' intentions, it nevertheless fails to cure the "indefinite nature" of the loans, which "defies legal enforcement," as discussed above. *Goldstein*, 859 A.2d at 329. This Court's role is not to reweigh the evidence or to substitute its judgment for that of the ALJ, but simply to adjudicate whether the ALJ's decision was supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls to the ALJ. *Mastro v. Apfel*, 270 F.3d 171, 179 (4th Cir. 2001) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Here the ALJ provided substantial evidence for her findings.

The Commissioner further argues that Ms. Hall's access to funds from the MPB Trust, her receipt of Social Security Retirement benefits, and other assets that she failed to report, constitute income or resources for the purposes of determining her SSI eligibility. Regarding

the MPB Trust, the ALJ found that Ms. Hall's "access to the trusts, specifically the MPB Trust, counts as a countable resource and income. The MPB Trust documents show that the claimant, as trustee, had the power to make distributions or divisions of Principal."[9] (Tr. 1071). Ms. Hall testified that the MPB Trust was for her benefit upon her mother's death, but until such time she borrowed against the fund, later repaying what she borrowed. (Tr. 1071). This is corroborated by a February 2004 letter from Ms. Hall's co-Trustee for the MPB Trust fund who stated that, "any and all funds used by Ms. Hall during this period when she has been barred from gainful employment are required to be reimbursed to the Trust," and that Ms. Hall "maintains a separate agreement to this effect with the Intermediate Beneficiary, Mrs. Robert Stewart." (Tr. 1560). The terms of the MPB Trust grant Ms. Hall considerable discretion as a Trustee. *See* (Tr. 668-69). However, they also mandate that the funds be used for the benefit of the Intermediate Beneficiary, Shirley Hall Batchelder, and that only upon her death, "this Trust shall be terminated and the Principal of this Trust, together with any unpaid income, shall be paid and distributed to the remainderman, Linda Hall Cullum . . . ." (Tr. 666). There is no evidence that the Intermediate Beneficiary of the Trust has deceased. As such, the Trust funds are still bound, under the terms of the Trust, for the benefit of Shirley Hall Batchelder. A separate agreement allowing Ms. Hall to borrow against the Trust does not negate the stated purpose of the Trust, nor does her discretion as a Trustee allow her to alter the intended use of its funds. Thus, I am unconvinced that the Trust itself should be counted as a resource. However, any funds Ms. Hall received from the Trust, which she retained until the following month, would constitute a resource under the regulations. *See* POMS SI 00810.030. Ultimately, I find the ALJ's error in counting the MPB Trust as a resource to be harmless, since Ms. Hall's income and resources otherwise exceed SSI limits as outlined below.

In addition to funds from the MPB Trust, the record also demonstrates that Ms. Hall began receiving Social Security Retirement benefits of $952 per month in October 2009. (Tr. 2014-16). Social Security Retirement benefits count as income for the purposes of determining SSI eligibility. 20 C.F.R. § 416.1124(c). The ALJ also notes additional resources, which Ms. Hall failed to disclose, including: a Mercedes Benz 380 SI, (Tr. 43); an offshore Canadian bank account, (Tr. 772); and access to a property in Virginia that would constitute a resource if not her primary residence, (Tr. 1069, 2393). These resources well exceed the monthly resource limit for SSI eligibility. Likewise, Ms. Hall's combined sources of income, all of which are sources of unearned income under the regulations, well exceed the $733 monthly limit on unearned income. Notably, Rev. Talar's monthly support or Ms. Hall's monthly retirement benefit award each, and separately, exceed this limit. Accordingly, I find that the ALJ provided substantial evidence in finding that Ms. Hall's income and resources exceed the limits set for SSI eligibility.

Finally, Ms. Hall argues that the ALJ committed procedural error by not issuing a subpoena commanding the testimony of Ms. Margery McIver, the PASS Cadre Specialist at the Towson Regional Office of SSA. PASS is a Plan to Achieve Self-Support. 20 C.F.R. § 416.1226. PASS is an SSI provision that allows individuals to set aside income and resources to

---

[9] The ALJ also noted that Ms. Hall is the sole beneficiary of the Shirley H. Stewart Trust, "a living trust designed to hold and manage her mother's assets until her death, when the claimant will become the sole income beneficiary." (Tr. 1064).

pay for items or services needed to achieve a specific work goal at the Agency's discretion. *Id.* A PASS program must be specifically designed for the individual and approved by the Agency. *Id.* According to Ms. Hall, Ms. McIver could have offered testimony regarding PASS Plans that she submitted to the Agency in 2002, and again at Ms. McIver's request, in 2009. She argues that this testimony would have provided information on the connection between her PASS Plan, which provides information about her efforts to re-enter the workforce, and "the underlying purpose of the loan agreements entered into by Plaintiff and her various lenders." Pl. Mem. at 18. Ms. Hall claimed that she initially filed an application in 2002 that was never processed prior to filing her second PASS application in 2009. (ECF No. 25 at 18). Accordingly, she argued that the ALJ should have issued a subpoena to the PASS Cadre Specialist to determine whether she would have been eligible from 2002 to 2008, and determined thereafter whether PASS eligibility would have affected her SSI eligibility. *Id.*

The Agency denied Ms. Hall's application for PASS on September 10, 2009, finding that Ms. Hall was not eligible for PASS because she was not eligible for SSI. (Tr. 1984). Further, the letter provided that she was not eligible for SSI because she had failed to apply for all Social Security benefits for which she was eligible, specifically SSA retirement benefits, as required under SSA regulations. *Id.* The letter noted that Ms. Hall's estimated retirement benefit would be $901.60, and that this would make her ineligible for SSI. *Id.* The ALJ held that Ms. Hall sought vocational services despite the fact that she knew she did not have an approved plan. Thus, she held that Ms. Hall's argument regarding PASS eligibility "as a matter of right must fail." (Tr. 1080); *see also* (Tr. 1713) (stating in a letter dated April 3, 2009, that the Agency uses "either the month we receive the PASS application or the actual date the pursuit of the work goal began. . . Under the rules of Administrative Finality, we cannot go back more than two years. . . [W]e would not retroactively approve a PASS back to the year 2000."). Based on the record before me, and the discretionary nature of PASS, I find that the ALJ supported her finding with substantial evidence.

For the reasons set forth herein, Ms. Hall's Motion for Reconsideration (ECF No. 40) is DENIED. Ms. Hall's Motion for Summary Judgment (ECF No. 25) is DENIED, and Defendant's Motion for Summary Judgment (ECF No. 30) is GRANTED. The Commissioner's judgment is AFFIRMED pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk is directed to CLOSE this case.

Despite the informal nature of this letter, it should be flagged as an opinion and docketed as an order.

Sincerely yours,

/s/

Stephanie A. Gallagher
United States Magistrate Judge